UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIUSZ MYSLINSKI,<br><br>      *Plaintiff*,<br>   v.<br><br>ARTHUR D'ANNUNZIO, JEWELRY DESIGNER SHOWCASE, INC., SEAN WILLIAMS, WILLIAMS & FOSTER CONSULTING GROUP, LLC, and DAVID ROSENBLUM,<br><br>      *Defendants*. | Case No.<br><br>**COMPLAINT** |

## SUMMARY OF ACTION

1. This is an action to recover the majority of Plaintiff's life savings, which were to be used to pay for his children's college tuition. As detailed below, Plaintiff's longtime accountant, Defendant David Rosenblum ("Rosenblum"), recruited him to participate in a fraudulent scheme run by Defendant Arthur D'Annunzio ("D'Annunzio"), the president and owner of Defendant Jewelry Designer Showcase, Inc. ("JDS"). This scheme promised huge returns if Plaintiff invested early. Rosenblum repeatedly vouched for D'Annunzio and JDS, building up D'Annunzio's credibility, and, following an elaborate dinner presentation and private meeting, D'Annunzio convinced Plaintiff Mariusz Myslinski ("Myslinski") to give him $100,000 to purchase private, non-registered shares in JDS. Based on additional fraudulent misrepresentations and omissions detailed herein D'Annunzio, JDS, and Rosenblum induced Myslinski to invest tens of thousands of dollars more into JDS and have refused to redeem Plaintiff's shares of JDS.

2. Sean Williams ("Williams") of Williams & Foster Consulting Group, LLC ("WFCG") and Rosenblum were instrumental to this scheme because they papered the supposed investments by issuing fraudulent documents and securities that (i) were not registered with the

Securities Exchange Commission and (ii) did not bear legends required for private, non-tradeable securities.

3. Nearly two years after first investing, and after JDS repeatedly failed to meet the statements D'Annunzio made to Plaintiff in his presentation and meetings, Plaintiff began to ask for his money back. D'Annunzio and JDS stalled for months. Indeed, they passed Plaintiff off to lawyers and Williams to further delay redemption of Plaintiff's supposed shares in JDS. Meanwhile, D'Annunzio, despite boasting about booming business, asked his existing investors to refer additional people who would invest in JDS.

4. Finally, at the end of 2019, D'Annunzio gave Plaintiff and his then-wife checks that could not be cashed. Indeed, when Plaintiff's ex-wife deposited her $55,000 check, it bounced, and Myslinski received an irate text message from D'Annunzio shortly thereafter exclaiming that: "The scheme you pull by depositing a check without letting someone know is under handed [*sic*] and dirty." But what is underhanded and dirty is running a Ponzi scheme, writing checks without sufficient funds to cover them, and then blaming the check holder for trying to cash checks so that they can liquidate their investment. Indeed, underscoring the nefarious nature of Defendants' fraudulent scheme, D'Annunzio implied that Myslinski was "snitching" and wrote that "we do not want anyone in this like that."

## THE PARTIES

5. Mariusz Myslinski is an individual residing at 16 Haag Street, Sayerville, New Jersey 08872. Myslinski, owns a small contracting company in New Jersey. At all relevant times herein, Myslinski was married to Angelika Grodzki ("Grodzki").

6. Arthur D'Annunzio is an individual who resides in New York. D'Annunzio has an office at 4366A Victory Boulevard, Staten Island, New York 10314.

7. Defendant Jewelry Designer Showcase, Inc. is a domestic corporation with an office located at office at 4366A Victory Boulevard, Staten Island, New York 10314. D'Annunzio is the president and owner of JDS.

8. Defendant Sean Williams owns, dominates, and controls Williams & Foster Consulting Group, LLC, and has a principal place of business at 3030 Middletown Rd., Apt. 5H, Bronx, New York 10461. At all relevant times herein, Williams has used WFCG to conduct fraudulent transactions with respect to the purchase, sale, and transfer of securities in JDS.

9. Defendant Williams & Foster Consulting Group, LLC is a domestic limited liability company having its principal place of business at 3030 Middletown Rd., Apt. 5H, Bronx, New York 10461.

10. Defendant David Rosenblum is an accountant who routinely performs accounting services in New York, transacts business with D'Annunzio in New York, including in connection with the fraudulent scheme alleged herein, and introduced Plaintiff to D'Annunzio and JDS.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 inasmuch as it alleges violation of the United States Securities Laws.

12. Venue is proper in this district under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS
### Background Concerning Defendants' Fraudulent Scheme

13. Upon information and belief, beginning in 2017, D'Annunzio launched a scheme to secure outside "investment" through JDS with false promises that he was going to sell JDS or take it public through an initial public offering. In furtherance of this scheme, D'Annunzio enlisted the assistance of Williams, WFCG, and Rosenblum.

14. Indeed Williams, who, upon information and belief, does not hold any license to buy, sell, or transfer securities in the United States, prepared numerous documents to be used in connection with this scam, including a purported "Accredited Investor Questionnaire" and "Stock Subscription Agreement" that referred to a supposed "Private Placement Memorandum."

15. However, Defendants knew that no such Private Placement Memorandum existed, and Plaintiff never received a Private Placement Memorandum regarding JDS.

16. Moreover, D'Annunzio, Williams, and WFCG disregarded the answers on the Accredited Investor Questionnaire and let practically anyone invest in JDS regardless of whether they qualified as an accredited investor.

17. As part of this scheme, Williams drafted and transferred, via means of interstate commerce, numerous unregistered, non-tradeable security instruments without the legends required by the SEC by law.

18. Moreover, D'Annunzio, JDS, Williams, and WFCG failed to submit any registration statement with the SEC for the shares in JDS that they were purporting to issue.

19. Rosenblum played a key role in this scheme by recruiting numerous investors to bring to dinners and parties hosted by D'Annunzio and JDS, and then following up with these marks to have them buy the securities D'Annunzio and JDS were selling.  This is how Plaintiff was induced to invest in Defendants' fraudulent scheme.

20. On or about November 29, 2017, Rosenblum identified an "opportunity" for his longstanding client, the Plaintiff, to invest in a private company, JDS.  Rosenblum stated that JDS would be sold in 2019, and that Plaintiff would make "at least 4 times" his investment.  Rosenblum knew at the time that he made the foregoing statements that they were false.

21. However, D'Annunzio had no intention selling JDS in 2019, and Williams and WFCG had no legal ability to facilitate the sale of JDS in 2019 because neither Williams nor WFCG had a brokerage license and could not legally transact business issuing, trading, or selling securities. Rather, they were engaged in a classic Ponzi scheme whereby initial investors were promised astronomical returns on investment. To keep this scheme going, D'Annunzio needed more and more investors to fuel the purported returns he was promising and cash out the early investors in his scheme. This is where Rosenblum came in.

22. Rosenblum was one such early investor. D'Annunzio had recruited Rosenblum, an accountant, to solicit his clients to "invest" in JDS, knowing that Rosenblum's clients would rely on the trust and confidence they placed in him to vouch for this supposed investment opportunity.

23. As payment for helping recruit supposed investors in JDS, D'Annunzio entered into a transaction with Rosenblum to invest in a building for $1.7 million and install Rosenblum's family as managers of that building, along with, upon information and belief, promising Rosenblum additional return on Rosenblum's own supposed "investment."

24. Rosenblum, a highly educated, sophisticated financial account, knew or should have known that D'Annunzio, JDS, Williams, and WFCG were engaged in running a Ponzi scheme. Nonetheless, Rosenblum, who had hundreds of thousands of dollars already invested in JDS and thus a substantial amount to lose if this scheme was uncovered, repeatedly assisted D'Annunzio, JDS, Williams, and WFCG in perpetrating their fraud.

25. Indeed, to further induce Plaintiff to invest in JDS, Rosenblum repeatedly stated to Plaintiff that his "life" was banking on this opportunity and that he had invested hundreds of thousands of dollars in JDS.

**D'Annunzio and Rosenblum Induce Myslinski to Invest in JDS**

26. Rosenblum, acting on behalf of and at the direction of D'Annunzio and JDS, invited Myslinski to a dinner on December 6, 2017 held at Nonna's in Nalalapan New Jersey, at which D'Annunzio wined and dined potential investors in JDS.

27. At this Dinner on December 6, 2017, D'Annunzio gave a presentation to Myslinski and others that contained numerous material falsehoods, including statements that:

   a. He was going to sell JDS or take it public in 2019;

   b. That he had a registered broker-dealer, namely Williams of WFCG, working to effect these transactions;

   c. That for those investors who purchased shares at $5/share, they were guaranteed returns of at least $8/share by mid-2018 based on a supposed private placement memorandum;

   d. That investors could redeem their shares at any time prior the JDS becoming public; and

   e. The price for the offering of shares of JDS to the public would be at least $75/share in its sale or initial public offering;

28. However, none of these statements were true. D'Annunzio did not intend to sell JDS or take JDS public in 2019—let alone at $75 per share. Upon information and belief, he had no buyer lined up to purchase JDS, and has never had such a buyer. Rather, D'Annunzio intended to keep recruiting new "investors" and pushing back the date of the sale or initial public offering. Indeed, to this day, JDS has not been sold and remains a privately-held company.

29. Moreover, neither Williams nor his company, WFCG, have held a securities license at any relevant time. Williams was not, in fact, working to take JDS public, but rather he was collecting fees for processing transactions and providing fraudulent paperwork to investors.

30. In addition, JDS's share price did not increase by $8/share in 2018, and D'Annunzio knew when he made this representation that this representation was false because it relied upon a supposed private placement memorandum that he knew did not exist.

31. Furthermore, D'Annunzio did not intend to let investors easily redeem their non-tradeable securities because this would undercut his ability to deliver large returns "on paper" to his investors.

32. As a result of the representations and omissions made by D'Annunzio at the December 6, 2017 dinner, along with Rosenblum's misrepresentations, Myslinski decided to invest in JDS. Therefore, he met with D'Annunzio on the following Saturday, December 9, 2017 at D'Annunzio's office on Staten Island. At this meeting, Myslinski handed D'Anunnzio a check for $100,000 to purchase non-public shares in JDS at a supposedly private pre-sale offering price of $5/share. Thereafter, Myslenski repeatedly provided D'Annunzio and JDS with more money to purchase shares in JDS based on D'Annunzio's and Rosenblum's material repeated misstatements and omissions.

33. Williams then issued non-tradeable, unregistered securities in JDS to Myslinski. Upon information and belief, these securities failed to bear any legend that indicated that they were unregistered and non-tradeable.

34. Rosenblum, on Myslinski's behalf, completed a supposed Accredited Investor Questionnaire, which he then forwarded to Myslinski to sign in front of a notary public. This

Accredited Investor Questionnaire was backdated to December 9, 2017, the date on which Myslinski purchased shares in JDS.

### JDS and D'Annunzio Delay Announcements and Pressure Existing Investors to Recruit Others to Participate in Their Fraudulent Scheme

35. By July 2018, D'Annunzio and JDS were beginning to run low on cash to redeem early investors' shares. Therefore, they asked existing investors to help them find new investors who may want to purchase private shares in JDS at the original price of $5/share. Ostensibly, this ask was so JDS could make its "minimum sales goal." To further motivate his investors, D'Annunzio foreshadowed that he would be making an announcement in August 2018 that shares would no longer be able to be purchased at $5/share. In other words, D'Annunzio was promising his existing investors an increased stock price if they could recruit new investors.

36. On August 30, 2018, D'Annunzio and JDS continued to urge investors to be patient, claiming that they had not yet met their minimum sales requirement of JDS stock to make an announcement, but that there would be an announcement shortly. Upon information and belief, this announcement was of a new, higher share price.

37. Behind the scenes, however, D'Annunzio was scrambling to keep his fraudulent scheme running and needed to buy more time to pay early investors back, so he told his investors that he had "stalled" the valuation of JDS because he wanted to obtain a reserve in shares. Thus, D'Annunzio, JDS, Williams and WFCG postponed the date for JDS to supposedly go public or be purchased from early 2019 to mid-2019.

38. Meanwhile Rosenblum, at D'Annunzio's direction, encouraged Myslinski to buy more stock in JDS. On or about November 9, 2018, Rosenblum stated that JDS's stock was "guaranteed" to be worth at least $20/share in 2019.

39. On November 16, 2018, Myslinski, based on Rosenblum's statements and believing that shares in JDS would increase to at least $20/share as guaranteed by Rosenblum, "invested" a further $20,000 into JDS shares.

40. On November 28, 2018, Plaintiff was invited to attend a Christmas Party thrown by JDS at 23 Jefferson Boulevard in Staten Island, New York. At that Christmas party, D'Annunzio continued to make false and misleading statements to Plaintiff, including that JDS was in the process of finalizing its initial public offering, and that its share price was certain to increase in 2019.

### JDS Fails to Engage in a Sale Transaction or Go Public In 2019, and Plaintiff Seeks A Return of His Funds, Only to Be Stonewalled

41. Defendants' scheme to defraud Plaintiff came to a head in 2019—the year that JDS was supposed to either be sold or go public. To keep his investors at bay, D'Annunzio maintained a façade of being too busy with JDS to pay attention to share redemptions. For example, he wrote to all of JDS's investors on January 15, 2019 that JDS was "in the process of completing a few steps and will be making any and all announcements upon completion. The JDS private placement has reached and exceeded every step of our goals . . . We have taken every step in a methodical way and will continue to do so to insure every aspect will be perfectly handled . . . . We are headed for a spectacular 2019 and we will all keep enjoying our journey together." D'Annunzio then directed his investors to contact Williams or himself with questions.

42. This communication contained several false and misleading statements. For example, JDS's supposed private placement had not, in fact, reached and exceeded every step of its goals, as evidenced by D'Annunzio's prior writing that JDS had not met its minimum sales goal, and so an announcement of increased share price had to be delayed.

43. Moreover, D'Annunzio dodged phone calls and repeatedly professed to be too busy with JDS and numerous side deals he referred to as "flips" to answer any substantive questions about redemption of any shares in JDS. Upon information and belief, the profits from these "flips" were being used to cover cash needs to pay out initial investors in D'Annunzio's fraudulent scheme.

44. To further prevent his investors from trying to redeem their shares in 2019, D'Annunzio continued to pump up JDS with proclamations of how JDS's best customers speak highly of JDS to others and how JDS's training, marketing, and promotional tools were the best in the industry.

45. Additionally, D'Annunzio wrote to Myslinski and others that the holiday season in 2018-2019 "was the biggest season in JDS history." Rosenblum parroted D'Annunzio's claims that JDS had more business than it could handle, and was wildly successful. Yet despite this supposed success, Defendants refused to redeem Plaintiff's shares in JDS.

46. In April 2019, Plaintiff began to have cash needs that required him to liquidate some of his investment in JDS. Therefore, he began to request a portion of his investment back, but D'Annunzio repeatedly put Plaintiff off.

47. Five months later, in September 2019, D'Annunzio directed Plaintiff to contact Williams to help him liquidate his shares in JDS. Rosenblum also directed Plaintiff to Williams to facilitate a sale of Plaintiff's shares in JDS. However, Williams failed to return calls and was generally unresponsive to Plaintiff's repeated requests.

48. In November 2019, Myslinski wrote to D'Annunzio begging for the money he invested to be returned because it was needed for Plaintiff's life expenses. Ostensibly,

D'Annunzio purported to "help" Myslinski by instructing Williams and an attorney to expedite redemption of Plaintiff's shares.

49. Defendants finally acknowledged Plaintiff's request to sell his shares in JDS through Williams, who indicated he would be subtracting a 10% fee for himself.

50. However, behind the scenes, D'Annunzio was, upon information and belief, directing Williams and his attorneys to delay redeeming Plaintiff's shares because JDS did not have sufficient funds to repay his investment—let alone the promised returns on that investment.

51. Finally, on December 5, 2019, after months of Plaintiff and Grodzky begging for their money back, D'Annunzio agreed to meet with Plaintiff and his ex-wife, and wrote each of them a check for $55,000. However, when Grodzki went to cash her check on or about December 18, 2019, it bounced for insufficient funds. Yet just days before, on December 9, 2019, D'Annunzio had boasted to his investors that JDS was "having a very busy selling season" and was "shipping twice as many reorders each day as we did [in 2018]," which was "very surprising since last season [JDS's] sales were the best recorded in all our years as a business."[1]

52. D'Annunzio and JDS then placed a stop payment on the remaining $55,000 check to Plaintiff, and angrily texted Myslinski that: "The scheme you pull by depositing a check without letting someone know is under handed [*sic*] and dirty."

53. No new checks have been issued to Plaintiff to allow him to recoup his investment. Nor have Defendants wired Plaintiff any of the money he demanded to be repaid for his shares in JDS.

54. Instead, D'Annunzio, JDS, Williams, and WFCG tried to defraud Plaintiff by writing him a worthless check and sign a release.

---

[1] D'Annunzio coupled this message with a notice that he was again delaying a public offering of JDS and that "we are going to contact you regarding any referrals you could provide to become JDS shareholders."

## AS AND FOR A FIRST CAUSE OF ACTION

**(Fraud in Connection with the Purchase or Sale of Securities Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Thereunder Against All Defendants)**

55. Plaintiff repeats and realleges the allegations contained in the previous paragraphs as though fully set forth herein.

56. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material fact or by omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

57. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Moreover, Defendants' actions in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder have caused Plaintiff damages in an amount to be determined at trial, but reasonably believed to exceed $335,000.

## AS AND FOR A SECOND CAUSE OF ACTION

**(Unregistered Offer and Sale of Securities Violations of Sections 5(a) and 5(c) of the Securities Act Against D'Annunzio, Williams, and WFCG)**

58. Plaintiff repeats and realleges the allegations contained in the previous paragraphs as though fully set forth herein.

59. D'Annunzio, Williams, and WFCG, by engaging in the conduct described above, directly or indirectly, made use of means or instrumentalities of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale.

60. No registration statement has been filed with the Securities Exchange Commission or has been in effect with respect to the offering alleged herein.

61. By engaging in the conduct described above, D'Annunzio, Williams, and WFCG violated and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).  The conduct of D'Annunzio, Williams, and WFCG has caused Plaintiff damages in an amount to be determined at trial, but reasonably believed to exceed $335,000.

## AS AND FOR A THIRD CAUSE OF ACTION

**(Fraudulent Inducement Against D'Annunzio, JDS, and Rosenblum)**

62. Plaintiff repeats and realleges the allegations contained in the previous paragraphs as though fully set forth herein.

63. Throughout the parties' relationship and as set forth above, D'Annunzio, JDS, and Rosenblum made numerous material misrepresentations of material fact to Plaintiff.  They also omitted material facts in their discussions with Plaintiff that could make their communications non-misleading, as set forth above.

64. D'Annunzio, JDS, and Rosenblum knew when they made the representations described herein that those representations were false, and they knew when they omitted material facts, these omissions made their communications misleading.

65. D'Annunzio, JDS, and Rosenblum made their false representations and omissions in order to induce Plaintiff to repeatedly invest in JDS and to prevent Plaintiff from redeeming his shares in JDS.

66. Plaintiff reasonably relied upon Defendants' material misrepresentations and omissions.

67. As a direct and proximate result of Defendants' material misrepresentations, Plaintiff has been damaged in an amount to be determined at trial, but not less than $300,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Fraudulent Concealment Against Rosenblum)

68. Plaintiff repeats and realleges the allegations contained in the previous paragraphs as though fully set forth herein.

69. As Plaintiff's accountant and financial advisor, and due to the special trust and confidence that Plaintiff reposed in him, Rosenblum owed fiduciary duties to Plaintiff.

70. Those fiduciary duties included, but were not limited to, duties of care, loyalty, trust, good faith, and fair dealing to Plaintiff. As such, Rosenblum had a fiduciary duty to disclose information that he learned that might be adverse to Plaintiff's interests.

71. However, Rosenblum concealed such information from Plaintiff, including, without limitation, that JDS was suffering from cash flow problems and that D'Annunzio needed additional investors in order to meet the returns he was promising to investors such as Plaintiff.

72. Rosenblum concealed this information because if it became known that D'Annunzio and JDS had cash flow problems and could not issue redemptions upon request, their

Ponzi scheme would collapse and Rosenblum would lose the hundreds of thousands of dollars that he had given D'Annunzio.

73. Plaintiff reasonably relied upon the lack of warnings or other red flags that Rosenblum should have disclosed to him to his detriment.

74. As a direct and proximate result of Rosenblum's concealment of material facts, Plaintiff has been damaged in an amount to be determined at trial, but not less than $335,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Aiding and Abetting Fraud Against Williams, WFCG, and Rosenblum)

75. Plaintiff repeats and realleges the allegations contained in the previous paragraphs as though fully set forth herein.

76. Defendants Williams, WFCG, and Rosenblum had actual knowledge of D'Annunzio's scheme to defraud Plaintiff and others like him.

77. Defendants Williams and WFCG provided substantial assistance to D'Annunzio and JDS in their scheme by, among other things, drafting fraudulent documents, and issuing unregistered securities in JDS.

78. Defendant Rosenblum provided substantial assistance to D'Annunzio and JDS in their fraudulent scheme by, among other things, actively seeking to recruit new participants to fund D'Annunzio's fraudulent scheme and soliciting his clients to invest additional funds in said scheme.

79. Defendants Williams, WFCG, and Rosenblum are thus liable to Plaintiff as aiders and abettors of the fraudulent scheme described in this Complaint in an amount to be determined at trial, but reasonably believed to exceed $335,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Negligent Misrepresentation Against Rosenblum)

80. Plaintiff repeats and realleges the allegations contained in the previous paragraphs as though fully set forth herein.

81. As set forth herein, Plaintiff and Rosenblum enjoyed a special, privity-like relationship that imposed upon Rosenblum a duty to impart correct information to Plaintiff at all relevant times.

82. In violation of this duty, Rosenblum repeatedly relayed incorrect, inaccurate, and misleading information to Plaintiff.

83. Plaintiff did not have reason to know that the information Rosenblum relayed was incorrect, inaccurate, or misleading because, *inter alia*, Rosenblum portrayed himself as D'Annunzio's confidant and thus privy to JDS's sales, revenue, valuation, and transactions. Thus, Plaintiff reasonably relied on the incorrect, inaccurate, and misleading statements that Rosenblum made to him about his investment in JDS.

84. As a direct and proximate result of the conduct alleged herein, Plaintiff has suffered severe economic injury in an amount to be determined at trial, but reasonably believed to exceed $335,000.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against D'Annunzio and Rosenblum)

85. Plaintiff repeats and realleges the allegations contained in the previous paragraphs as though fully set forth herein.

86. As Plaintiff's accountant and financial advisor, and due to the special trust and confidence that Plaintiff reposed in him, Rosenblum owed fiduciary duties to Plaintiff.

87. As President of JDS, a closely-held corporation, D'Annunzio owed his minority shareholders, such as Plaintiff, fiduciary duties.

88. The fiduciary duties owed by D'Annunzio and Rosenblum included, but were not limited to, duties of care, loyalty, trust, good faith, and fair dealing to Plaintiff.

89. In violation of these fiduciary duties, and as described more fully herein, Rosenblum repeatedly misrepresented the purported investment "opportunity" in JDS to Plaintiff.

90. Similarly, and in violation of these fiduciary duties, and as described more fully herein, D'Annunzio repeatedly misrepresented JDS's financial affairs, among other material facts.

91. As a direct and proximate result of the conduct alleged herein, Plaintiff has suffered severe economic injury in an amount to be determined at trial, but reasonably believed to exceed $335,000.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Unjust Enrichment Against D'Annunzio, JDS, Williams, and WFCG)

92. Plaintiff repeats and realleges the allegations contained in the previous paragraphs as though fully set forth herein.

93. By receiving Plaintiff's funds and not returning them, D'Annunzio and JDS have been enriched at Plaintiff's expense.

94. Similarly, by taking a commission in connection with the purchase or sale of securities without having remitted funds to Plaintiff, Williams, and WFCG have been enriched at Plaintiff's expense.

95. It is against equity and good conscience to allow D'Annunzio, JDS, Williams, and WFCG to retain Plaintiff's funds.

96. Plaintiff has thus been damaged in an amount to be determined at trial, but reasonably believed to exceed $335,000.

WHEREFORE, Plaintiff demand judgment as follows:

a. On Plaintiff's first cause of action, enjoining Defendants from violating Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as well as awarding a judgment in Plaintiff's favor and against all Defendants in an amount to be determined at trial, but reasonably believed to exceed $335,000;

b. On Plaintiff's second cause of action, enjoining Defendants from violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), as well as awarding a judgment in Plaintiff's favor and against Defendants D'Annunzio, Williams, and WFCG in an amount to be determined at trial, but reasonably believed to exceed $335,000;

c. On Plaintiff's third cause of action, awarding a judgment in Plaintiff's favor and against Defendants D'Annunzio, JDS, and Rosenblum in an amount to be determined at trial, but reasonably believed to exceed $335,000;

d. On Plaintiff's fourth cause of action, awarding a judgment in Plaintiff's favor and against Defendant Rosenblum in an amount to be determined at trial, but reasonably believed to exceed $335,000;

e. On Plaintiff's fifth cause of action, awarding a judgment in Plaintiff's favor and against Defendants Williams, WFCG, and Rosenblum in an amount to be determined at trial, but reasonably believed to exceed $335,000;

f. On Plaintiff's sixth cause of action, awarding a judgment in Plaintiff's favor and against Defendant Rosenblum in an amount to be determined at trial, but reasonably believed to exceed $335,000;

g. On Plaintiff's seventh cause of action, awarding a judgment in Plaintiff's favor and against Defendants D'Annunzio and Rosenblum in an amount to be determined at trial, but reasonably believed to exceed $335,000;

h. On Plaintiff's eighth cause of action, awarding a judgment in Plaintiff's favor and against Defendants D'Annunzio, JDS, Williams, and WFCG in an amount to be determined at trial, but reasonably believed to exceed $335,000;

i. Awarding punitive damages;

j. Awarding pre-judgment and post-judgment interest on all amounts recovered;

k. Awarding Plaintiff his costs, expenses, and reasonable attorneys' fees; and

l. Awarding any such other and further relief as the Court may deem just and proper.

Dated: White Plains, New York
      May 21, 2021

                                              **CERMELE & WOOD LLP**

By:   */s/ Benjamin M. Rattner*
      Michael R. Wood
      Benjamin M. Rattner
      *Attorneys for Plaintiff*
      2 Westchester Park Drive, Suite 110
      White Plains, New York 10604
      (Tel.) 914.967.2753
      mike@cw.legal
      ben@cw.legal